May it please the court. Your Honor, my name is Nate Washington. I am counsel for the appellant, David Collie. The case before the court this morning is emblematic of the sorts of dangers to certain members of the community face when they, the dangers they face. Try to keep your voice up good and robust so at least I can, I mean I can hear you but not as well. Yes, Your Honor. There you go. Thank you so much. This case is emblematic of those dangers that certain people in our community face by virtue of factors beyond their control. What this case shows us is that how certain biases and non-existent threats combined with poor policing practices are used to justify the use of lethal force against suspects. On the night of July 27, 2016 David Collie was a 5 foot 6 inch, 150 pound, 33 year old African-American man. He had the great misfortune of encountering off-duty police officer Hugo Barron. As Mr. Barron searched for suspects, there were listed as 6 foot 1, 180 pounds with an afro, and 6 foot 4. For Mr. Collie, that great misfortune would lead to him being shot in the back from a distance of 33 feet, 11 inches away, per the City of Fort Worth Police Reports. Paralyzed from the chest down. It is the position of the appellant this morning, Your Honors, is that the trial court erred in granting summary judgment for three main reasons. Number two, it was clearly established that a officer may not use lethal force against a suspect that presents no threat to the officer or to a third party. And then number three, if time permits, that the granting of summary judgment in this case was premature. Let's start here. We've got the video, I mean it's in the video, the slides, etc. Address your material issue of fact dispute. Yes, Your Honor. The material issue of fact, it's evident in a few ways. Number one, Hugo Barron claims that David Collie had something in his hand. That is the self says his hand was empty. The video produces no evidence of anything in Mr Collie's hand. We have the declaration of the CEO of 21st Century Forensics Animation, who states that if there was something in Mr Collie's hand between the light from the patrol car, the floodlight from the building and the flashlight of Deputy Flores, that a metal object would produce some sort of glaring, some sort of reflection or something that he calls gleaming in his report. All of those things are missing. Not only that, as also indicated in the report prepared by 21st Century Forensics Animation, Mr Collie's right palm is visible when he turns around and faces the officers. That right palm never goes back into his hand. So when Mr Collie extends his hand out in front of him, which becomes then the second point that brings us to an issue of genuine dispute, Mr Collie's claim is that he raised his arm in front of him. As we can see from the video, Deputy Flores is behind him as well as Officer Barron. In fact, what we learned from the 360 degree laser mapping of the area is that Deputy Flores is 24 feet, 24.8 feet away and she is 94 degrees behind Mr Collie. We can determine that Mr Collie's hand is in front of him, his feet are facing forward and that both officers are behind him. But I thought the sequence of events showed that they had asked him to stop and turn around. I mean, they were yelling at him. Well, you're correct. And he appeared not to be paying attention, that's what they say. Well, you're correct in that they were yelling at him, Your Honor, and it's debatable in terms of what they were from both Deputy Flores as well as Officer Barron. And they are yelling what seems to be potentially conflicting commands about remove your hands from your pockets or show us your hands. Mr Collie's position, Your Honor, is that he attempted to comply and upon attempted to comply with those demands, he was then shot in the back. When you allude to the possibility of profiling about the six foot one defendant, wasn't this the dispatch alert? Actors are two black males who left on foot to an apartment complex on Normandy. CP had met these actors on Facebook to buy shoes. Actors, no shirt, basketball shirt and no shirt, khaki pants. One actor had a small silver handgun. That is only partially correct, Your Honor. As we learned from the interviews from Deputy Flores as well as Officer Barron that they gave that night, there were there was not only the text that that was sent to their audio recording. There was a audio command that went out. There was a call from the witnesses. There were on duty officers who met and staged at the gas station that that Officer Barron drove right past on his way to shooting Mr Collie. All of these things were there and available. One thing that appellant or the appellee argued below is that, well, you can't determine when Mr Barron or when Officer Barron received this information. And to the third point, which I guess we'll get to now, is that the appellant believes he should have been entitled at a minimum to discovery to determine exactly when Officer Barron learned, which is undisputed, that the suspects were six foot 118 and six foot four. It's also worth noting that Mr Collie was confirmed by the on the suspects. What if the apparently there was a box cutter recovered at the scene? Is that one of the material issues of fact that you're highlighting that the box cutter was not in the possession of your client? It is, Your Honor. Was it ever tested for fingerprints or anything? Is there any way to it to resolve the issue of whether it is or is not the property or in the was in the possession at the time? That again goes to the third point that at a minimum, some sort of discovery should have been granted before summary judgment was was granted in this cause because there is nothing in the record to suggest that Mr Collie on that box cutter. Not only that, if we look at the police reports, there are different statements as to where the box cutter was recovered. Not only that, we never see in the video ever this box cutter. There are two videos that actually a part of the record. There's a it's a body camera video that gets turned on and off by Officer Baron, and there's also the dash camera video which contains no sound. The declaration of Mr Stewart from 21st century and a mate forensics and animation makes clear that that video has been altered in some way and that the metadata has been removed. So what would the commands that that the police gave at the time you mentioned something about? Show us your hands. Are you contending that they were conflicting commands given? Or was it raise your hands or? Well, that's just it. Your honor. There are two officers yelling at Mr Collie, one of whom has a gun pointed at Mr Collie who comes downstairs and is confronted by two police officers, one with guns, both yelling at the same time. Is he complying with one and not the other? Is that your theory as to how this happened? Or was he not complying with either one of them and just ignoring our theories that he tried to comply? He's startled is our position. Um, he's not again. It's confirmed. He's not the robbery suspects, so he's not the robberies. Either of the robbery suspects. That's that much is clear. So when he is confronted by two police officers yelling in one point in a weapon, that is not something that a person deals with on a daily basis. It takes a few seconds to process and figure out the best way to respond. Mr Collie did that. He attempted to do that by removing his hands from his pockets, and I would grant to the court. Surely he was slow for one that it took him approximately three seconds to make this happen. But again, three seconds is not a lot of time when you're startled and confronted at gun point. But it took him approximately three seconds to remove his hands from his pockets. Um, and he attempted to inform the officers where he was going when he outstretched the right hand in front of him. The officers who were behind him shot him in the back. There is no evidence before this court to suggest that Mr Collie had anything in his hand beyond the self serving affidavit of Hugo Barron. That is a material issue of go back to something you just said. He was attempting to show them where he was going. It was that part of the command that was given to him about where where are you going or anything like that? Or what's up with it? Did they tell him to stop and raise his hands or show us your hands? There's no indication that they that the officers asked Mr Collie where he was going. What I think that myself and the appellee will agree on is that the officers did tell Mr Collie to remove his hands from his pockets and to show his hands again. Mr Collie, not the suspect, but not the person who committed the robberies. He startled by two officers at gunpoint. He removes his hands. He's walking as the court sees from the video. He's walking through the parking lot. He's attempting to show the officers where he's going. He has a vehicle parked in that parking lot. At that point, he is shot in the back. There there are. But have they told him to stop? It seems to me if they're going to show us your hands, that's that's one way to comply with that is to not continue to walk. And if I understand your testimony, I mean, your argument, you're saying that he didn't stop and said, I'm proceeding toward my vehicle or, you know, my car's over here. Is that? Well, it's certainly true, Your Honor, that he did not stop again. There was no discovery in this case. And so beyond the audio tape interviews of Deputy Flores and Hugo Barron, we're not exactly sure what was said. Other than we do know that there is a conflict and there are two people yelling at this man who again is not the person who commits the robbery. Is it also Barron's body cam, which well, it worked. Is it his body cam or Officer Flores that, uh, I think of the testimony. The brief says they punched it on and off. The green light was on whatever it recorded some. But there's no audio on the body cam in order to be able to hear the commands. Is that correct? Two things, Your Honor. The body cam belongs to Officer Barron. There is audio on the body cam, but you cannot hear any of the exchange between Officer Barron or Mr Khali or any of the commands that were yelled by Deputy Flores. So Officer Barron is in charge of both the dash camera video, which is missing sound and metadata. And Officer Barron is in charge of the body camera. What kind of metadata would you have on a on a, you know, this dash cam? Well, you'd be able to know when the video was made. You'd be able to know whether or not anything has been removed, edits or deletions to the dash camera. That sort of information is missing. So Officer Flores is closest. They're looking at the picture. Looks like she's closest to Mr Khali, right? She is closest, Your Honor. She's 24.8 ft away, right? So in the briefing, at least the red brick, I think the list that, you know, he was pointing towards her. You understand first that they're both behind. But my point is so she did not have a body cam on as well. She's closest to him. She hurt. She doesn't have a body cam. I don't. We're only talking about what Officer Barron's body cam. Is that correct? We would assume she did not have a body camera, Your Honor. But the truth of the matter is, we simply don't know, and we were not allowed to conduct discovery. What we do know as it relates to that issue of the pointing is that Mr Khali's hand is outstretched. Deputy Flores is 94 degrees behind him. It's absolutely the athlete disputes it. But the facts make clear that Mr Khali did not point in the direction of Deputy Flores, as claimed by Officer Barron. That is a genuine, factual dispute issue that should be presented to a trial to a jury. I reserve. I'm sorry. No, you've you've reserved your rebuttal time. Thank you. All right, Mr East. Oh, argument. But just so I don't forget, we eliminate. So is it correct? As the officer Flores, I hope I'm saying their ranks right. There may be more than just officers, so I don't mean any disrespect if they're more than an officer. But I'm just saying it that way. Ask the floors. There is no body cam or whatever. When we're reading about the body cam or whatever, it's asked to to to bear. Is that correct? Yes, sir. Okay. Deputy Flores was a just want to be correct on the facts. All right, you press it. There is no body camera whatsoever for Deputy Flores. Nobody camera whatsoever. Nobody camera whatsoever of the shooting itself. Only dash cam. Okay. And then my other question regarding the box cutter. Was that ever fingerprinted at all? Is that information that so none of that's in the summary judgment record. And my argument is assume he didn't have the box cutter. We think he did. But for summary judgment purposes, assuming he didn't because that's not a fact we're relying on. In this case on the evening in question, my client was a Fort Worth police officer riding with a Tarrant County Sheriff's deputy called to the scene of an armed robbery. Suspects fleeing on foot. They go from their location toward the call location. On the way there, they see a suspect, a person fitting the suspect description. The only suspect description they had unrefuted in the record is Judge Jones pointed out. Black males, both shirtless, one wearing shorts, one wearing pants, on foot, one armed with a handgun. Plaintiff's argument below was that the officers made a mistake because they shouldn't have stopped when they saw the suspect. They should have kept going to the scene so they could have gotten the full description. They never had the full description when they encountered the suspect. They pull into the parking lot, light him up with their headlights. He turns, immediately walks away. They get out. They're both yelling, stop, show us your hands, stop, show us your hands. My client had his gun withdrawn because of the gun report. He had it pointed toward the ground. As Mr. Colley started walking more quickly and toward the edge of a building where he could take cover, he raised his gun, both yelling, stop, show us your hands. And to demonstrate, if Deputy Flores is over there and I'm the suspect and Judge Englehart is my client, I'm going to be like this. And suddenly, within the span of a single second, as can plainly be seen on the video, he raises his hand, spins in that direction, covering 14 frames of the video within a single second. This motion is all my client had to evaluate, whether or not he was going to wait and see if he shot the deputy or whether he took action to stop the threat. In that, in what you're saying about the framing, you're asserting a brief that in fact, I mean, when we look at it, you see his hand out. There's no doubt about that. Yes, Your Honor. But you're testifying that both the officers are behind him, if you will, Flores is closest to him. But I'm getting to the point, you're asserting the brief and are you saying that the pictures will show that his outstretched arm is directed towards Deputy Flores as opposed to the assertion that his hand is either pointed toward his car down the alley or whatever? Without any question, Your Honor. The expert report Plaintiff relies on is among the more interesting I've ever seen, Your Honor. What that expert says is that the suspect went like this, and you can see on the video, you can see on my frame-by-frames, he ends up pointing directly at the deputy, if not directly within an imperceptible angle. But the expert says if you go back in over here, not at the deputy. That's all he analyzes. He says he picks frame 377, what he calls 377, because it was the one that was best lit. He admits it was 0.4 seconds before the time the officer shot, and he doesn't dispute that his arm was swinging rapidly in that direction. There's just no dispute about that. You see it on the video. Another side note, if you will, Plaintiff's counsel refers to all kinds of things that are not part of the summary judgment record, and none of it matters, and you're welcome to look at any of it you like, but the summary judgment record presented by the plaintiff in this case was the expert's report and a barely one-two-page affidavit from his client where he doesn't refute, refusing commands, raising his hand, swinging it around. He doesn't refute any of that. There are numerous cases from this circuit where courts have upheld officers' qualified immunity on much more difficult facts than this, Your Honors. In Ontiveros v. City of Rosenberg, a case that both Judge Jones authored and Judge Stewart was on the panel, a suspect was fatally shot by police after reportedly reaching into a boot that he was holding. There were factual disputes about whether or not the boot was in the area where he could have been holding it or things of that nature, but the only evidence that was considered was that the act described by the officers, and that was the only evidence they had in that case, would have presented a reasonable officer on the scene. The action is judged from the perspective of a reasonable officer. It was enough to justify the use of force. In Ballard v. Burton, Judge Stewart wrote that force must be judged from the perspective of a reasonable officer. Factual disputes abounded in that case, as Judge Stewart wrote, including even whether the officer fired the shot that ended up paralyzing the plaintiff may have known that the suspect's gun was empty. That did not even matter because what you judge is from the perspective of a reasonable officer. If Officer Flores thought he saw a knife or he didn't think he saw a knife, a reasonable officer and Officer Barron, I'm sorry, seeing this action under those circumstances, as seen plainly on the video, more than justified him protecting his fellow officer's life and firing the shots he fired. In Salazar-Limon, an officer shot and paralyzed an unarmed suspect. Court recognized factual disputes they held to be immaterial in that case and upheld qualified immunity. In Carnaby v. Houston, cited in my 28J letter, a suspect was stopped who didn't cooperate and when he was getting out of the car, he moved his hand toward an officer. An officer on the other side of the car saw that action, fired. He was holding nothing. A wallet was found near where he was standing. In Thomas v. Baldwin, and this may be for the knife issued, the most analogous case, officers claimed that the suspect raised his hand and he was holding something, brought his hands together and he was shot. Plaintiffs argued that while the knife was found so far away from him, he couldn't possibly have been holding it at the time. The court said it didn't matter. The totality of the circumstances considered from the perspective of a reasonable officer, the action of the suspect would have justified feeling threatened and using force. I've been looked at these pictures a bunch and I don't understand, I mean, this was quite a shot on the part of Officer Barron. Does the video show the suspect go down? Yes, Your Honor. It does? Well, I'm just looking at the angles because it looks to me as if the suspect is turning like that and his back is not really in the line of fire. I mean, it looks to me as if he's not in the line of fire. I mean, his arms are spread out here, deputy here, my client over here. He's walking away, refusing commands to stop, refusing commands to stop. And then he's turning. All of a sudden, raises up, swings like this. I understand that. Shot from that direction, hits him right here. Oh, into there. Okay. All right. And it hit the spinal cord. It passed by it and, yes, paralyzed this person, unfortunately. And it's a tragic result. There's no question about it. But Officer Barron's decision was, do I wait and see what happens? Or do I fire and protect my fellow officer under circumstances where there's a suspect who fits the description? I've looked at this and then I've looked at these frames over and over and over and over and over. I'm just missing the part that you just said. I'm not saying it's not true, but this clearly can tell this arm coming around. That's the part I haven't locked in on yet. Not the arm being out, not the relative positions of where I got that in terms of how both are. But this part, I mean, obviously it's different between a still photo and a video. The still photo is just showing the frame, but it's difficult to discern. I'm not saying what you're saying isn't true. I'm just trying to get there in terms of the best view on this video, given the rapidity with which this is occurring of this arm moving. If I can help you, Your Honor, and this is the quintessential split-second decision. It is, I guess, a single exact second. If you look at the frame-by-frames that I've provided and you look at the very first one and then you look at the very last one and look where he's pointing in the very last one and understand that from one to the other was a single second. But I couldn't put the video in my brief, and if you look at the video, there's no question what you're seeing. There's just absolutely no question what you're seeing. No, I looked at it. I looked at it hurriedly, I will admit, but I did look at it. And knowing that we were going to be illuminated by oral argument will help when looking at it again. Yes, Your Honor. I will point out that- Come back to one thing, just to clarify. Okay, you said both officers gave the command, you know, show your hands. Is that what you're arguing? That they both, that Flores and Barron both- They were both saying, stop, show us your hands, stop, show us your hands. So to the somewhat oblique point of potentially conflicting commands, you're saying there's no dispute about there was one command and that was, I mean, one as a singular one, but the same command by both the officers, to show your hands. Stop, show your hands, stop, show your hands is what is in the record the officers said. And none of them said swing your arm across toward the deputy, you know, stop. He didn't stop. Show your hands may be this, but it's certainly not what he did. And as Judge Jones wrote in the Manis v. Lawson case, you know, if the suspect was trying to tell us where he was going or not, we can't ever make that determination, nor is it relevant to what the officer on the scene perceived or reasonably perceived, which was a motion of somebody about to shoot his fellow officer. One of their complaints is that there wasn't any discovery in this case. They never asked for it, Your Honor. Right. Okay. But, I mean, what was the timing between, and I've forgotten this, I know I read it, but between when the case was filed and when you moved for summary judgment? It wasn't a particularly long period of time. There was a summary judgment. There were preliminary motions. Claims were narrowed. There was a discovery stay in light of qualified immunity. There was an expedited briefing schedule. So they had plenty of opportunity to file discovery requests. They had every opportunity in response to the summary judgment to file a 56D motion, which is what the procedure calls for, and say, this is what I need and this is why I need it. And they simply didn't do that, Your Honor. And the other half of the qualified immunity test, of course, is whether or not the officer acted reasonably in light of clearly established law. And in this case, the plaintiffs, interestingly, have always taken the position that we don't have to show you a case that is on point. We don't have to show you a case that is tied to the facts of our circumstance. And the district court even noted that in his opinion, that the plaintiffs refused to try to show a case that was factually similar. In the meantime, we've had the Vahan opinion out of this court, Mullinex v. Luna prior to that, White v. Pauley, and then Kistler v. Hughes and D.C. v. Wesby, where the Supreme Court has repeatedly and repeatedly and repeatedly mandated that courts have to view facts, especially in Fourth Amendment, especially in excessive force cases, have to view cases in light of- Well, frankly, I sort of agree with them on this position, but the case law is not in their favor. I mean, you know, there are plenty of cases that involve split-second decisions resulting in officers shooting guns. And as far as I'm aware, just about all of them, you've cited a bunch of them, go against the plaintiffs ultimately, where there was any cause to, you know, a reasonable belief on the part of the officer that somebody was going to be threatened. So this is all a pretty well-trod ground. It is, Your Honor. Particularly, the courts have rejected the notion that you can simply say, as Appellant does here, an unarmed, non-resisting, non-threatening suspect you can't use deadly force against. Well, that's the exact formulation, citing Tennessee v. Garner, which the plaintiffs do, that the Supreme Court has rejected over and over again. And interestingly, in the Vahan v. City of South Haven case out of this court, Judge Haynes wrote a dissent to the original opinion on motion for rehearing. It was flipped, and her dissent became the unanimous per curiam opinion. And in that case, she wrote that when a plaintiff fails to cite cases that are factually on point, even at the district court level, it dooms his case on appeal. And I point that out because even on appeal, plaintiffs haven't satisfied their burden, but it is an odd situation where district courts are told to require factually specific case law, and if they don't get it, they grant summary judgment, and it goes up on the Court of Appeals, and plaintiffs come cite new cases, and it gets reversed, and the district courts are helpless in those situations. And I think that it's also consistent with our case law that says we don't consider new arguments on appeal for what that's worth. In the Guerra case out of this court, the officer shot what turned out to be an unarmed suspect, and the court came to the same conclusion that the facts, when viewed from the eyes of a reasonable officer, easily justified qualified immunity. And I also want to point out— It's not material to appeal, but was the real perpetrator ever located? No, Your Honor. And whether Mr. Gawley was a real perpetrator or not, I'll concede let's say he wasn't. I don't know the answer to that. The real perpetrators were never caught, but based on the description these officers had, they had every reason to fear that he was and to investigate and to be concerned that he might have been. Well, I wasn't pushing back on that exact point, but saying, you know, he's 5'6", and everybody says other people are 6'1", da-da-da, didn't like anything showing he was the perpetrator, is not part of the equation. I was just curious about all the police presence there. Absolutely willing to believe he was not the perpetrator and know the actual perpetrator was never caught. This was a holdup outside a convenience store, called police, they get there, and the suspects are seen leaving but never found. And Officer Barron didn't have the benefit of video viewed in slow motion and a frame-by-frame analysis with 360-degree high-tech imaging, and the case I cite in my 28-J letter out of the Eighth Circuit is very on point in that case, where they said in that case the court actually found that if you look at the video in slow motion, unlike here, if you look at the video in that case, it did not support the officer's claim that the gun was pointed where he said it was pointed, but they said somewhere in the arc of movement a reasonable officer could have felt a threat and noted that the officer doesn't have the benefit of such technology when he's on the scene making split-second decisions. And the claim that the officers, that was argued below, that the officers exposed themselves by getting out of their vehicle and not taking cover, or the officers should have gone and investigated and gotten more facts before they stopped, none of that's relevant, but even if it were, from a factual, outside-looking-in perspective, it's not where we judge the use of force. We judge the use of force from the moment the use of force decision is made. At the moment his arm swings around, that's the moment in time where we judge the officer's actions based upon the totality of circumstances known to him, and that was the exact case that I argued to Judge Stewart in the Davis v. Romer case a few years ago where a police officer was trapped on the side of a speeding SUV, and the argument was, well, he shouldn't have been there, and the analysis was, well, he was, and he was in danger at the moment he chose to use force. Unless the Court has any other questions. All right, thank you, sir. All right, back to Washington with Bo. Hey, Police Court. Very briefly, Your Honor, so I'd like to address this claim by the appellee that Mr. Colley spun around in an attempt to point towards Deputy Flores. There is no evidence to support that claim. That is a dispute. It is a very material and genuine dispute to this case. In fact, and again, the report from 21st Century Forensics and Animation, and of course the eyes of this Court, shows that there is nothing to suggest that Mr. Colley attempted to spin toward either officer. All right, well, we got you on your opening in terms of facts and, you know, the argument about disputed fact. Park that for the moment and address the case law. Counsel opposite has cited the cases. You know their legion, regrettably. Yes, sir. From my standpoint, regrettably in the sense that there's a lot of tragedy involved in the cases, as is here, but the case law is out there. We have no shortage of qualified immunity cases. They're from the Supreme Court, from here, et cetera. So address in your rebuttal not so much back on the facts. We've got it, but you need to address it. It is what it is, and you know we're not authorized to make brand new law. So within the scheme of what's out there, what's your take? I understand, Your Honor. First I'll start with Tolton v. Cotton with the Supreme Court rules. When there is a factual dispute, all reasonable inferences are to be drawn in the favor of the non-movement. Trial court below, as well as the appellee, relied pretty heavily on White v. Polley. White v. Polley was a case where essentially the Supreme Court says, unless there is something to put the officer on notice that his actions are against the law. All right, but get within the context. He said when he got up, okay, he didn't want to fight over whether the box cutter was there or not. He says he'll assume for the sake of this argument, which would be taking the view in the light, most favorable to the non-movement, that the box cutter was not in Mr. Polley's hands. So that piece is not, he says, it doesn't help you. So assuming all the rest of it within the cases, which talk about the split second of the officer, not looking with hindsight, etc., etc., deal with that. I'm not asking you to abandon your argument about facts, but I'm saying the cases say what they say. So how does this case fit within the officers are on the scene, they see what they see, etc., it's all split second. What's the delineation? What is the demonstrable difference here in terms of what the Supreme Court told us? Sure, and within the context of the argument, Your Honor, what's important to note is that the cases that the appellee relies upon, they are fact-determinative cases. White v. Polley, even this court's ruling in Surratt v. McLaren, when Judge Jones indicated, it was not clearly established that applying force to a suspect's face in order to remove evidence that she was allegedly eating was clearly established. But what has been clearly established is that the use of lethal force against a suspect that presents no risk of harm to the officer or any other person is not permissible. Within the balance of the context or within those cases, a lot of times- I think all the facts that are here, and I assume for the sake of the answer to this question, I think they're all in favor of your position, that the commands, etc., etc., etc., boxcutter of the whole shmeal. So within taking that, within the framework of qualified immunity law, what the officers need to know, etc., the split second, etc., what's your most potent argument? My most potent argument there, Your Honor, is that Deputy Flores is on the scene. She does not have a weapon drawn. She continues to advance toward Mr. Colley until after Officer Barron fires his weapon. As the Supreme Court noted in the Tolton v. Cotton case, when there are disputed issues, all those reasonable emphases must- I said that, but I said assume. I know what Toland says. We know what it says. Those are the ones where they said we didn't take it. I said assume for the sake of this question that all the facts are construed in favor of the non-movement, which would be your client, right? I'm saying give your best shot on the law with those facts framed that way. A best shot on the law framed that way, Your Honor, would have to be essentially white v. Polley because what we're able to see in white v. Polley, the seminal Supreme Court case that's being relied upon nowadays, is that it was so fact-determinant. It was such a new issue in that there is a shootout going on, and the court says that the officers involved do not have to announce that they might use deadly force when they arrive. Let me ask you one question. I realize you're out of time. I'm sympathetic to your plea regarding discovery. Any litigant who doesn't get discovery and has a claim dismissed seems to cry out for some examination of why. Counsel made reference to 56D. Did you endeavor to list under 56D, if I had discovery, it would show the following? Of course, we want to be specific on that. If I deposed Officer X, I would expect that her testimony might be such and such. If I had documents from Agency Y, I suspect they may have given insight as to procedure, whatever. Did you employ any of the 56D device that might have assisted with your plea for discovery? Thank you, Your Honor. The first thing I'd like to do in addressing Your Honor's question is Appellee claims that the appellant had plenty of time for discovery. This case was abated, Your Honor. The appellee did not have time for discovery. This case was abated. Twenty-one days after the abatement was lifted, summary judgment was granted. To the court's point, I did not make a showing or a proffer to the trial court to show it which evidence I expected to receive, if I had the opportunity to conduct discovery. Again, twenty-one days after a case being abated, the granting of summary judgment was premature at that point. All right. All right. Thank you, counsel. Both counsels got ample in the briefs, et cetera. The case will be submitted. We'll figure it out, and we'll decide it. Before we move, as I said, at the outset, to…